

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 29, 2022

**BY ECF**
The Honorable Sidney H. Stein
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re:   *United States v. Desirae Schneider*, 20 Cr. 325 (SHS)

Dear Judge Stein:

      The Government respectfully submits this letter in advance of the sentencing of the defendant, Desirae Schneider, for her probation violations. For the reasons explained below, the Government submits that a sentence of 60 months' imprisonment would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

**I.    Background**

    **A.**    **Original Offense Conduct**

      In September and October 2018, the defendant paid for the murder of her wife. As described further below, the defendant took multiple, calculated steps to pay for the murder and to attempt to hide her tracks. Fortunately, the murder was never carried out, and the defendant's wife was not physically harmed.

      The defendant's plot to murder her wife began on or about September 14, 2018, when the defendant placed an order on a dark web website ("Website-1") to kill her wife. (PSR[1] ¶ 12.) Website-1 is a now defunct scam website that advertised to customers that they could pay for an act of violence to be committed against a victim. (PSR ¶ 10.) The most expensive service listed on Website-1 was murder, of which the cost ranged from $5,000 to $200,000. (PSR ¶ 10.) To pay for the acts of violence, Website-1 suggested that customers convert cash to bitcoin to pay for the acts of violence. (PSR ¶ 11.) However, after placing the murder order, the defendant expressed concern to Website-1 that purchasing a large amount of bitcoin to pay for the murder would look suspicious. (PSR ¶ 13.) In response, Website-1 instructed the defendant to lie and state that she simply "want[ed] to invest in bitcoin all your savings." (PSR ¶ 13.)

---

[1] "PSR" refers to the defendant's presentence report, dated June 15, 2021.

Once the defendant placed her order, she then took several steps to pay for the murder and cover up her involvement. On September 16, 2018, the defendant took out a $6,000 loan in the name of her wife, and she never told her wife about the loan. (PSR ¶¶ 16, 24.) On the same day, the defendant created an account with Coinbase, a cryptocurrency exchange. (PSR ¶ 15.) On September 19, 2018, using her newly created Coinbase account, the defendant purchased bitcoin worth approximately $6,170. (PSR ¶ 16.) However, the bitcoin was not immediately available. As a result, the defendant informed Website-1 that it could take up to 12 days for the defendant to be able to pay for the murder order. (PSR ¶ 17.)

On September 19, 2018, the defendant also created a new email address and opened a new account on another cryptocurrency exchange, Localbitcoins.com. (PSR ¶ 18.) The defendant then transferred almost all of the bitcoins from her newly created Coinbase account to her newly created Localbitcoins.com account. (PSR ¶ 18.) Following the instructions to lie from Website-1, the defendant wrote in the "Notes" column of several of the transfers that the transfers were for "investment[s]." (PSR ¶ 18.) On October 1, 2018, the defendant completed her plan. She transferred almost all of the bitcoin in her newly created Localbitcoins.com account into a bitcoin wallet controlled by Website-1, and the defendant informed Website-1 of the transfer. (PSR ¶ 20.)

On April 12, 2021, the defendant pled guilty to one count of murder for hire, in violation of Title 18, United States Code, Sections 1958 and 2.

### B. Original Sentencing

On June 30, 2021, the parties appeared for sentencing. The defendant's guidelines range was 87 to 108 months' imprisonment, based on a total offense level of 29 and a Criminal History Category of I. At sentencing, the Probation Department recommended a sentence of 60 months' imprisonment. The Government argued for a sentence within the Guidelines range, given, among other things, the extraordinarily serious nature of the offense and the series of complex steps the defendant took over a two-week period to pay for the murder, the need for just punishment, and the need for specific and general deterrence. The defendant requested that the defendant be sentenced to five years' probation. On June 30, 2021, the Court adjourned sentencing and requested that the defense provide a report about options for residential psychological therapy for the defendant. In response, the defense provided a proposal for intensive outpatient psychotherapy and 200 hours of community service as a condition of probation.

On November 3, 2021, the parties appeared again for sentencing. That day, the Court sentenced the defendant to five years' probation. The Court recognized that the defendant's sentence was "unusual" given the fact that the defendant had committed a "very serious crime." (Nov. 2021 Sent. Tr. 20.) When explaining the below-Guidelines sentence, the Court stated that the defendant's conduct was "clearly aberrational behavior given the rest of her life, her substantial remorse, and her mental state at the time of the crime and her complete lack of any prior contact with the criminal justice system." (*Id.* 13.) The Court stated: "If there is any violation of any condition of probation, whether a mandatory or standard or special condition, I want that brought to my attention immediately and we will deal with it at that point and then I will probably conclude that I was mistaken in my calculation and we will deal with that violation, if it occurs." (*Id.* 11.)

### C. Conduct While on Probation

The defendant commenced probation in November 2021. In addition to the violation specifications that the defendant admitted to (which are described in detail in the next section), the defendant has had several compliance issues while on probation. According to the probation report dated May 12, 2022, the defendant failed over 40 random check-ins on her location monitoring equipment. (Violation Report at 2.) While the defendant stated that some of the missed check-ins occurred while she was sleeping or due to issues with the location monitoring equipment, the defendant readily acknowledges that these explanations do not cover all of her missed check-ins. (*See* Defense Letter, dated June 23, 2022 ("June 2022 Defense Letter"), at 3.) In addition, despite several requests, the defendant failed to provide documentation verifying her employment. (Violation Report at 2.) After following up with the defendant, the probation office learned that the defendant had been terminated with one of the employers and that the defendant overstated her expected earnings for another. (June 2022 Defense Letter at 2.)

### D. Probation Violations

Between the summer of 2021 through January 2022, the defendant stole approximately $18,079.50 from her former roommate ("Victim-1"). Specifically, in or around April 2021, the defendant and Victim-1 agreed to live together. To pay for rent, Victim-1 paid the defendant half of the rent, and the defendant agreed to send the full monthly rent to the management company (the "Management Company"). After the defendant moved out of the apartment in or around June 2021, the defendant agreed to continue paying her half of the monthly rent and sending the full rental payment to the Management Company after receiving Victim-1's share.

However, in September 2021, Victim-1 received an email from the Management Company stating that Victim-1 and the defendant owed a significant amount in back rent. The defendant told Victim-1 she would address the issue. Around the same time, Victim-1 received an email from an email address that looked like it came from an employee at the Management Company ("Victim-2"), when, in fact, the email address was fake and Victim-2 never sent that email. The email claimed that the defendant had resolved the back rent issue.

In or around December 2021 or January 2022, the lies continued. Around that time, Victim-1 learned that the defendant never solved the back rent issue and that the defendant had received eviction papers in or around October 2021. When Victim-1 raised these issues with the defendant, the defendant came up with more lies. First, the defendant emailed Victim-1 a screenshot of the defendant's bank statement which purportedly showed that the defendant had paid back the rent. However, the screenshot was fake. Second, the defendant claimed she would hire a lawyer to address the rent and eviction issues. But the defendant never contacted a lawyer. Instead, she created another fake email address that was associated with an actual lawyer ("Victim-3"), and, using the fake email address associated with Victim-3, the defendant claimed that the lawyer would address the eviction issues. Suspicious of the email purportedly from Victim-3, Victim-1 asked for the full contact information of the purported lawyer that the defendant hired. In response, the defendant supplied (i) a website, which contained Victim-3's photograph, (ii) a phone number that was actually subscribed to the defendant, and (iii) the fake email address for Victim-3, which was subscribed to the home where the defendant was living.

The defendant was eventually confronted, and, in January 2022, the defendant's mother paid the full balance on the rent.

On July 6, 2022, the defendant admitted Specifications 1 and 2, which stated, respectively, that the defendant (i) committed wire fraud in that she stole approximately $18,079.50 from Victim-1, and (ii) committed aggravated identity theft in that she impersonated Victim-2 and Victim-3 in furtherance of the wire fraud.

## II. Discussion

### A. Applicable Law

#### a. Probation Violations

Under 18 U.S.C. § 3565, if a defendant violates probation, a court may continue probation or revoke the sentence of probation and resentence the defendant pursuant to the statutory provisions generally applicable to criminal sentencing, which includes the factors outlined in 18 U.S.C. § 3553(a). As the Second Circuit has explained, a "district court may revoke the probationary sentence and resentence the defendant to any sentence that the district court could have originally imposed for the underlying crimes." *United States v. Hurtado*, 756 F. App'x 63, 67 (2d Cir. 2018). Therefore, "a probation violation does not trigger a sentence for the violation conduct, but a resentence on the crime of conviction, taking into account that the defendant has breached the trust placed in [her] by a probationary sentence." *Id.* (citation omitted).

The Guidelines range for sentences following probation violations "are derived from advisory policy statements based on the grade of probation violation and the violator's criminal history." *Id.* (citation omitted). However, there are several instances in which departures may be warranted. For example, an upward departure may be warranted "[w]here the original sentence was the result of a downward departure." *Id.* (citing U.S.S.G. § 7B1.4 application note 4). *See also, e.g.*, *United States v. Verkhoglyad*, 516 F.3d 122, 133 (2d Cir. 2008) (affirming a district court's upward departure in light of the "enormous sentencing breaks that it had repeatedly afforded" the defendant and determining that "it had erred in affording [the defendant] leniency on [the defendant's] underlying crime of conviction").

Here, the defendant was in Criminal History I and she committed Grade B violations, so the applicable sentencing range is 4 to 10 months' imprisonment. *See* U.S.S.G. § 7B1.4. However, as noted above, the Court may consider the defendant's original Guidelines range of 87 to 108 months' imprisonment and can sentence up to the statutory maximum of the original sentence, which is 10 years' imprisonment. *See Verkhoglyad*, 516 F.3d at 130 n.5 ("While a district court is not restricted to the Guidelines sentencing range applicable to a defendant's underlying federal offense when sentencing a defendant for a violation of probation, neither is it precluded from considering that range when, on revocation of probation, it carries out its statutory duty to impose a sentence on the underlying crime of conviction that is sufficient, but not greater than necessary to comply with the purposes set forth in § 3553(a)(2)." (citation omitted)); *id.* at 135 ("[O]n

revocation of probation, a resentence that falls within the range for the underlying crime of conviction will rarely qualify as too severe to be substantively reasonable.").

### b. 3553(a) Factors

A sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)-(7). *See Gall,* 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant;
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### B. The Court Should Impose a Sentence of 60 Months' Imprisonment

A sentence of 60 months' imprisonment would appropriately take into account the U.S.S.G. policy statements and factors set forth in 18 U.S.C. § 3553(a).

First, an incarceratory sentence is necessary to reflect the seriousness of the defendant's original and instant conduct, promote respect for the law, and to provide just punishment for the offenses she committed.

The defendant's initial offense was extremely serious and dangerous—she paid for the murder of her wife. Over a 15-day period, the defendant took several calculated steps to pay for the murder, including by taking out a loan in her wife's name without telling her. The defendant also attempted to hide her conduct in many ways, including by creating a new email address in order to open a cryptocurrency exchange account to pay for the murder. Fortunately, Website-1— the hitman website where the defendant placed the murder-for-hire—was a scam website, and the wife was never physically harmed. But the defendant's intention was the opposite. In fact, the defendant made sure to inform Website-1 once she successfully transferred her full payment to Website-1.

While the conduct underlying the probation violations did not place anyone in physical danger, the conduct is nevertheless serious in that it makes clear that the defendant's criminal conduct was not aberrant and, instead, is part of a pattern of demonstrated disregard for the law,

poor decisionmaking, and calculated efforts to deceive and/or harm others. In the instant probation violations, the defendant lied to Victim-1 several times about the status of their rental payments. The defendant also created fake email addresses and impersonated Victim-2 and Victim-3 in an effort to cover up those lies. A period of incarceration is thus necessary to address this pattern of misconduct and also to protect the public from the fact that both the underlying conduct and the instant conduct were perpetuated by the defendant from behind a computer screen.

Second, an incarceratory sentence is necessary to reflect the defendant's serious breach of the trust this Court gave the defendant when it sentenced the defendant to a period of probation. Rather than take advantage of that opportunity, the defendant continued to engage in the unlawful conduct underlying the instant offense. In fact, at the time the Court imposed its sentence in November 2021, the defendant had already begun engaging in the lies that formed the basis of the instant violations by sending emails while purporting to be Victim-2.

Third, an incarceratory sentence is necessary for both specific and general deterrence. With respect to specific deterrence, as already stated, the defendant has demonstrated that she has not been deterred from engaging in additional criminal conduct. In addition, just like the underlying crime which occurred over a two-week period, the instant conduct was not based on a spur-of-the-moment decision. Instead, the defendant took several steps over many months to lie to Victim-1 and to impersonate Victim-2 and Victim-3. As for general deterrence, there is a strong need to send a message that, if a defendant pays for the murder of another person—even if that person is not harmed—the defendant will face serious consequences.

### III. Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence of 60 months' imprisonment.

Respectfully submitted,

DAMIAM WILLIAMS
United States Attorney

by: /s/ Rebecca T. Dell
Rebecca T. Dell
Assistant United States Attorney
(212) 637-2198

cc: Roberto Finzi, Esq. (ECF)
Probation Officer Adam Pakula (Email)
Probation Officer Seth Grennan (Email)