```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                          20 CR 325 (SHS)

 5   DESIRAE SCHNEIDER,

 6              Defendant.                  Sentence on Violation
                                           (via Microsoft Teams)
 7   ------------------------------x

 8                                          New York, N.Y.
                                           September 23, 2022
 9                                          10:00 a.m.

10   Before:

11
                       HON. SIDNEY H. STEIN,
12
                                           District Judge
13
                            APPEARANCES
14
     DAMIAN WILLIAMS
15        United States Attorney for the
          Southern District of New York
16   BY:  REBECCA DELL
          Assistant United States Attorney
17
     PAUL WEISS RIFKIND, WHARTON & GARRISON LLP
18        Attorneys for Defendant
     BY:  ROBERTO FINZI
19        CHLOE E. LEWIS

20   Also Present:
     Adam S. Pakula, U.S. Probation (SDNY)
21   Seth Grennan, U.S. Probation (ND ILL.)

22

23

24

25
```

```
 1                    (Case called)
 2                    MS. DELL:  Good morning, this is Rebecca Dell on
 3      behalf of the government.
 4                    THE COURT:  Good morning.
 5                    MR. FINZI:  Good morning, your Honor, this is Roberto
 6      Finzi.  I am here with my colleague, Chloe Lewis, on behalf of
 7      Ms. Schneider.
 8                    We are also joined, your Honor, by Ms. Schneider's
 9      mother, April Hoffinger, and her father, Paul Hoffinger.  I
10      think you should be able to see them next to her on the screen.
11      We also have several other family members on the line:  Her
12      sister, Kate Frederickson, and her brother-in-law, Brandon
13      Frederickson, and also a couple of friends, some of whom also
14      submitted letters, your Honor.
15                    THE COURT:  Good morning.
16                    Ms. Schneider, can you see and hear me?
17                    THE DEFENDANT:  I can hear you.  I cannot see you.
18                    THE COURT:  My camera is off and it doesn't want to go
19      on.
20                    Can you see me now?
21                    THE DEFENDANT:  I can, your Honor.
22                    THE COURT:  Ms. Schneider, we have been through this
23      before.  In order to proceed by video conference, I need you to
24      consent to do so.  And I have before me a consent to proceed by
25      video conference in which it states that you voluntarily
```

1  consent to participate in this proceeding by video conference.

2  It appears to be signed by you.  Is that correct?

3         THE DEFENDANT:  Yes, your Honor.

4         THE COURT:  Mr. Finzi, you have signed it as well?

5         MR. FINZI:  I did, your Honor.

6         THE COURT:  I am going to accept it, and we will

7  proceed by video conference.

8         I do make the finding that the ends of justice are

9  better served by proceeding this way so that it can be

10  adjudicated, the issue can be adjudicated speedily.

11         This has been going on for quite some time.  I have

12  all of the submissions.  Ms. Schneider admitted to

13  specifications 1 and 2, which are quite serious.  Mr. Finzi's

14  position is that we need to continue her, Ms. Schneider's

15  interventions, that is, her mental health treatment, and that

16  she has a job.

17         And the government's position is that she should be

18  sentenced to 60 months.  I think the guideline range is

19  something like 87 to 108.  And the probation department has

20  recommended 36 months.

21         For the record, Mr. Pakula is on as well.

22         Good morning, Mr. Pakula.

23         MR. PAKULA:  Good morning, your Honor.

24         MR. FINZI:  Your Honor, we may also have probation in

25  Illinois, Mr. Grennan.  I don't know if he is on by phone.

1          THE COURT:  Wonderful.  I would want him on.

2     Mr. Grennan are you on, by teleconference?

3          MR. GRENNAN:  I am, your Honor.  Good morning.  Seth

4     Grennan, United States Probation.

5          THE COURT:  Wonderful.

6          Mr. Finzi, why don't I hear from you first.  What is

7     your position now?

8          MR. FINZI:  Your Honor, my position -- I won't go on

9     at length because I know you have received our submissions and

10    letters from people, many of whom are on the phone.  But our

11    hope, your Honor, for reasons I can get into or answer the

12    Court's questions, is that we not send Ms. Schneider to jail.

13    There are one of two ways that we would propose going about

14    that, if your Honor is so inclined.

15         THE COURT:  I'll listen to that.  But the mountain

16    you're facing -- and you are well aware of this, Mr. Finzi, and

17    I stated it on the several conferences we have had -- the legal

18    professionals on the call all know how extraordinary it was

19    that I sentence this defendant to probation.  It wasn't

20    really -- legally, it's a variance, but we all know it's much

21    more than that.  I really went out on a limb, as it were.

22    That's not fair.  It's not a limb.  Nothing -- there was no

23    reversal here.  But it was most unusual.

24         And the violations that the defendant has pled to are

25    most serious.  They are not so-called technical violations.

1    Wire fraud, aggravated identity theft.  I understand there are

2    serious mental issues driving this, and I understand the

3    efforts that have been made by the defendant, and the support

4    of her family is nonstop.  I certainly hope she appreciates

5    that.

6          But at some point the criminal justice system just

7    can't keep forgetting that there are these violations.

8    Although I certainly will hear from Ms. Dell, it seems to me

9    that some credit has to be given to the proposition that jail

10   time may in fact result in conduct that's more law abiding.  In

11   other words, there may be some real benefit to jail time.  Not

12   only in terms of deterrence, although I think that's -- general

13   deterrence, I think that's not a great issue here because the

14   circumstances of this are so individualistic.  I don't think

15   they are great general deterrence possibilities.  And

16   certainly -- I don't know about punishment, but certainly there

17   is some law for that.  Certainly the possibility of having

18   Ms. Schneider know that there are real consequences to criminal

19   wrongdoing.  Again, this is not breaking curfew.  These are

20   major, major violations.

21          So you have my thinking.  You know I don't hide

22   things.  Speak to me.

23          MR. FINZI:  I know you don't, your Honor.  I also will

24   start by saying I understand and I think, like you said, all of

25   the legal professionals understand the extraordinary break, for

1    lack of a better word, that you gave Ms. Schneider the first

2    time around.  I have explained that to her.  But she doesn't

3    need it explained to her.  She totally understands what an

4    extraordinary sentence that was and what an extraordinary bet

5    on her it was.

6        THE COURT:  It's not, you don't understand what I did,

7    so now I am going to get you back.  It's not that.  It's the

8    patience of the law only goes so far.

9        MR. FINZI:  Here is what I am suggesting, your Honor,

10    as a possible alternative.  And I also want to get to the

11    reasons for that.

12        Another way of achieving what I am trying or we are

13    trying to suggest is to effectively adjourn this sentencing for

14    a period of time, 90 days, 180 days, to give her the

15    opportunity to continue on the track record.  That way, your

16    Honor will not have made the decision, imposed the sentence.

17    We can be back with a big body of data.

18        The reason I say that, Judge, is I am totally aware of

19    the need for Ms. Schneider to understand that her actions have

20    consequences, and I am totally aware of the need for the Court

21    to, in addition to -- send a message isn't the right word, but

22    you know what I mean.  There be some component of general

23    deterrence and specific deterrence.  But there are certain

24    factors of this case that really do make it extraordinarily

25    unusual.

1              What I'm talking about is the following.  And with

2     respect to the violations, Judge, I don't want to -- I am not

3     going to defend the indefensible.  I am not going to explain

4     the unexplainable.  Ms. Schneider stole from a friend and then

5     lied about it and there is no excuse for that.  All we can say

6     about that is that it did not involve any violence.  It did not

7     involve narcotics.  It did not involve firearms.  It did not

8     involve either sophisticated means or multiple victims or all

9     those things we typically view as really aggravating factors,

10    either under the guidelines or otherwise.  That is not to

11    minimize it.  Any time a defense attorney stands up at

12    sentencing, it sounds like I'm trying -- I am not trying to

13    minimize it.  I am trying to sort of contextualize it in the

14    array of offenses.

15             What I think is really extraordinary about this case,

16    your Honor, is the need for sophisticated mental health

17    treatment.  When I say sophisticated, I don't mean

18    experimental, but it's mental health treatment that has various

19    components that just we believe cannot be met in prison.

20             THE COURT:  I am prepared to accept that.  So what?

21             MR. FINZI:  So what is, your Honor, what we are

22    sentencing her to, if she is not going to get the appropriate

23    mental health care in prison for a period of time, we are

24    sentencing her not just to a period of incarceration, but a

25    period of risk of relapse and of losing all the good work that

1    we have made so far.  She won't get the same medical treatment

2    or the same regime.  She won't get the same therapy.  She won't

3    get the same assistance that she is getting.  And, more

4    importantly, she won't have the extraordinary support network

5    that she has now with her family, with her community, with the

6    work she is doing.

7            I think, Judge, if we take a step back and look at

8    what has happened over the last seven months, and I use seven

9    months for a reason because that is when she moved to Illinois,

10   effectively, or completed the move to Illinois.  That is when

11   she came under the supervision of probation in Illinois.  And

12   that is when the efforts began in earnest, I'd say, to address

13   the various components of her life that need to be addressed

14   for her to be productive and move forward.

15           And those are:  One, work; two -- and I'll come back

16   to each of these -- two, mental health and treatment; three,

17   the community, both in terms of community service and building

18   kind of a structure around her that's there for her.

19           And all of this starts, your Honor, with a reaction,

20   and we alluded to this in our papers, a reaction to these

21   violations that is different in kind and degree and that I

22   think speaks to the progress here.  This may not be clear in

23   the offense, but Ms. Schneider took steps to address these

24   violations before they were brought to the Court's attention.

25   The victim was repaid -- I know it's not a defense.  I know you

1  could never say to a jury, the victim was repaid, therefore I'm

2  not guilty.  I am not saying it for that purpose.  I am saying

3  it for a completely different purpose.

4          THE COURT:  But her parents have constantly been

5  bailing her out.  That's out of love and out of pain.  But that

6  doesn't get to the point of whether she needs to understand she

7  can't do this.

8          MR. FINZI:  Your Honor, that's true to a point.  But

9  it's not just bailing her out financially.  She has moved home.

10  She is living with her parents.  She is under their constant

11  care and supervision.  She is repaying them.

12          So on the sort -- on the work front she has, and this

13  is -- she has established a business with clients, clients that

14  are now returning to her.  It's one thing to get a client.

15  It's another thing to have a client come back.  So she has set

16  up this kind of forward momentum of doing something positive.

17          My initial reaction to that, Judge, was, how is it

18  that somebody with this past is going through a business of

19  life coaching, but then you realize, when you stop for a

20  second, that that's exactly -- just like former addicts speak

21  to addicts.  Just like people -- this is somebody who has been

22  through trauma and is in a position to help people through it.

23  And that has been an incredibly positive experience, both

24  financially, where she has had issues before, but even in terms

25  of feeling like she is sort of reintegrating and getting back

1    in, and she has made extraordinary progress there and will

2    continue to make it.  That's on the work front.

3           On the mental health front, she has, for the first

4    time now, an arrangement that's a psychiatrist she sees -- a

5    psychologist she sees every week for therapy, with whom she has

6    been discussing all of these issues and who she sees regularly.

7    She has a psychiatrist who prescribes her medications.  She has

8    a regimen of medications that, knock on wood, and we all know

9    how complicated these things are, are working and are showing

10   some positive effects.

11          She is engaged in her community.  Whatever the issues

12   were with her starting the community service, and maybe Mr.

13   Grennan can speak to that, because of the difficulty in placing

14   her, given her record, but she is now regularly volunteering at

15   a food bank, where people drive up in cars.  They kind of place

16   orders, for lack of a better term, of the groceries they need.

17   Wal-Mart and other companies provide it.  And she is in the

18   warehouse putting together and -- kind of putting together the

19   baskets and running that.  She is also volunteering at a local

20   nursing home.

21          Those are just positive things, Judge.  They are not

22   positive as in, you know, the last month.  They are positive as

23   in the last six months.  And I believe that there are

24   trajectories and there is momentum to stories like this.  And

25   interrupting that momentum right now and not just punishing her

1    by putting her in prison and away from loved ones, but

2    punishing her in a way that she cannot get the access to the

3    family, the health care, the employment.

4           THE COURT:  Let me be clear.  When I said so what, it

5    wasn't that there is nothing wrong with mental health treatment

6    in prison.  I'm perfectly prepared to believe that she is

7    getting better mental health treatment now than she will in

8    prison.  But the point is, maybe she needs to understand that

9    criminal wrongdoing puts a lot of things at risk, including

10   continuity of treatment.

11          MR. FINZI:  That's fair, your Honor.  And sometimes

12   people need a shock to the system.

13          THE COURT:  As always, you went right to the nub.

14   That's what we are talking about here, sir.

15          MR. FINZI:  Before doing that, your Honor, we really

16   would, given the progress she has made and given -- with

17   tremendous effort from herself, from her family, from loved

18   ones; frankly, from us, your Honor, and our interactions with

19   her.  Interrupting that progress now, when there are

20   alternatives, seems, respectfully to us, a step too far.

21          THE COURT:  I understand your position.  Why don't you

22   bring it to a close.

23          MR. FINZI:  I'll wrap it up, your Honor.

24          For all those reasons, there are two ways, if your

25   Honor were so inclined, we could accomplish that goal.  One is

1   to resentence her to a period of probation with a continuation

2   of the conditions so that what she is doing she is doing -- if

3   she fails to see her psychiatrist for one week, that's a

4   violation.  If she fails to show up for her -- I personally,

5   your Honor, can be involved in the reporting on this, if that's

6   easiest.  If she fails to satisfy --

7           THE COURT:  You know as well as I do that when that

8   happens you are going to be telling me about the addicts who

9   fall back constantly, but the forward movement is there.

10  That's not going to do much.  I appreciate what you are saying.

11          MR. FINZI:  One possibility is that.  The other

12  possibility is, again -- and this will test whether she needs

13  the shock to the system -- this will test whether her support

14  system is all that.  If we adjourn this proceeding for 90 days,

15  we come back in 90 days.  We will have that much more track

16  record.  In the meantime, I don't think anybody can argue, and

17  I don't hear your Honor saying she is a danger to the community

18  and needs to be kept off the street.

19          If we were to hit pause for 90 days, come back and

20  reevaluate, all your options would still be on the table.  The

21  only difference is, we would have more information.

22          THE COURT:  Thank you.  I understand.

23          Ms. Dell.

24          MS. DELL:  Yes, your Honor.

25          We disagree that she should adjourn sentencing for 90

1       or 180 days.  At the initial sentencing the government

2       strenuously argued for a period of incarceration, in light of

3       the very serious nature of the initial crime and the complexity

4       of the crime.

5              The government's understanding is one reason that the

6       defendant was sentenced to a probationary period was the belief

7       that that initial crime, that very serious crime that could

8       have resulted in the death of someone, was a mere aberration.

9       But the defendant's recent conduct, her probation violations,

10      and -- show that it was not an aberration.  In fact, just like

11      her initial crime, which took place over a two-week period, the

12      specifications to which she pled guilty to here occurred over

13      many months.  Indeed, she was committing that crime while she

14      was being sentenced on her initial crime here.

15             And the government disagrees that during this period

16      there weren't additional victims.  In fact, the roommate faced

17      eviction and, without the help of the defendant's parents, she

18      might have been out tens of thousands of dollars.  And two

19      additional victims, unbeknownst to them, had their identity

20      stolen, and they were impersonated.  One of the victims is a

21      lawyer, and the defendant created a fake website impersonating

22      that lawyer.  It's unclear if anyone visited that website and

23      thought it belonged to the victim.

24             But this is troubling.  This is, again, not a

25      spur-of-the-moment decision by the defendant.  These are

1    concrete actions she is taking over several days, several

2    months.

3          THE COURT:  What about Mr. Finzi's point that the

4    origin of all of this lies in mental issues that need

5    addressing, not incarceration?

6          MS. DELL:  That was the opportunity that the defendant

7    was given initially approximately a year ago when we appeared

8    before your Honor.  She was sentenced to a period of probation,

9    which was a significant break from the guidelines.  And rather

10   than using that opportunity to better herself, she engaged in

11   this crime.

12         It's not just the aggravated identity theft and the

13   wire fraud.  The probation officer can probably speak to this

14   more closely than I can, but there are also multiple issues

15   with her probation:  Missed check-ins, incorrect information

16   about her employment.  I understand she is now working on her

17   community service hours.  But that didn't begin until we all

18   appeared before your Honor a couple of months ago.  Whatever

19   system the defendant had set up after the initial sentencing,

20   it didn't work.  And in the intervening period there were

21   victims who were harmed as a result.

22         As a result, there is simply a strong need here for

23   both specific deterrence, the need to punish the defendant for

24   her crimes, and to protect the public from future crimes of the

25   defendant.

1          THE COURT:  Thank you.

2          I want to hear from Ms. Schneider, if she wishes to

3    address the Court now.  But then I am going to see if Mr.

4    Pakula or Mr. Grennan want to weigh in.  I'd welcome any of

5    their thoughts.  But I am not obligating them to go on the

6    record here.

7          Ms. Schneider, you have the right to speak to me.  You

8    don't have to say anything.  As I've said before in these

9    conferences, I certainly said it at your original sentencing,

10   you need to know that anything you say can be used against you.

11   But if you want to talk to me, I'm here.

12         THE DEFENDANT:  Thank you, your Honor.  I hope it's

13   OK.  I wrote it down.

14         THE COURT:  Of course.

15         THE DEFENDANT:  Can you hear me OK?

16         THE COURT:  I can.  As I said before also, when people

17   are nervous, and they read, for each of those reasons they tend

18   to go quite quickly.  We have a reporter on this call, so

19   please read slowly.

20         THE DEFENDANT:  Thank you for the reminder.

21         I want to start by saying that I take full ownership

22   for what has brought us here today.  I am regretful for the way

23   I handled the situation and any and all pain that I caused Sara

24   through my misguidedness.

25         I also want to acknowledge that I took full ownership

1   since the moment this event came to a head in January.   I

2   immediately responded by getting my parents involved, calling

3   my lawyer for guidance, and communicating with both of my

4   therapists at the time.   I hope to also give you context and

5   not excuses to what happened.   Nothing I did was with malice

6   intent but, as we have spoken to through a mental health

7   crisis, my fragile world was crumbling around me.

8           My act of not paying rent was not with the intention

9   to steal.   I had expected a residual commission check, and I

10  had convinced myself I could fix the situation with time.   And

11  throughout that event I truly believed I could.   Sara and I

12  were both in incredibly fragile places and it was my fear that

13  this one more thing would break the both of us.   You can have

14  uncovered many triggers and still have many to go, and you can

15  have good intentions and still create harm.   This is what I've

16  learned, that two things can be true at once.

17          While there are similarities in my actions to my

18  previous offense, there are stark differences in my response.

19  This event when came to a head was handled immediately, before

20  the Court was involved, and consistently over the course of the

21  months that led up to it being brought before you.   My parents

22  and my lawyer worked to ensure that Sara was communicated with

23  and taken care of.   I worked with the management company with

24  my parents' assistance to ensure all that we owed was paid in

25  full within three days.

1          I also spoke with my therapist immediately about the

2     event because of my fear of the event, and we got right to work

3     in cognitive therapy and EMDR to uncover the lingering wounds

4     and triggers that led up to it.  I did all of this work for me

5     and for my future and to ensure I did not hurt anyone else.

6          I did all of this privately.  For Sara, for myself,

7     for my parents, and for my healing.  All of this was done and

8     begun to be worked on months before it came to your attention.

9     I spoke to you last, expressing my acknowledgement of my need

10    to heal.  Any responsive mercy is truly the reason I've gotten

11    as far as I have today.

12         To date, I have completed seven months of EMDR

13    therapy, where we worked on past trauma and triggers that were

14    the cause of my PTSD and dissociation disorder.  I remained and

15    will continue to remain in cognitive therapy where we continue

16    to address coping mechanisms for the stressors, as well as my

17    ongoing depression, insomnia, and anxiety disorder.  I have

18    worked with my doctors so we can continue to adjust my

19    medication as needed.

20         I have leaned on my parents, family, and close circle

21    in times of distress or hard days.  While the enormous progress

22    I have seen specifically over the past nine months has been

23    fine, it's been the army around me that has made it possible.

24         When I came before you in November, I thought the next

25    steps would be easier.  While I have lived every single day

grateful to be home with my parents, I also had to contend with everything else I was facing.  I lost my partner, my apartment, my job, my community in New York.  I learned that my conviction made it really hard to apply for jobs.  I was educated for and my work history lends itself to, and I was rejected for several jobs because of that.  Even with the help of probation, I could not find a place that would allow me to do community service due to my conviction.  Despite all the work I was doing in therapy, I found myself stuck in a loop of rejection.

This event in January was the catalyst of a major breakthrough in my healing.  Through EMDR, cognitive therapy, and conversations with those closest to me, we were able to find a major set of wounds that we hadn't gotten to yet.  This, I learned, is a huge part of healing such an enormous wound such as mine.  You must heal some parts to get to the next.

Through this breakthrough I realized that I had to create work for myself.  I knew I wanted to help people.  I knew that I wanted to make good of my story, even these really ugly parts.  I wanted to help others realize the very thing that I have fought my whole life to understand that all of us are enough, that we are all worthy of healing.

So I started my own life coaching business.  I decided through my education and counseling and my own life experiences, such as now and therapy and my ten years of experience building startups, I knew I could do it.  And it has

1    taken daily dedication, but I now have 15 reoccurring clients.

2         I've been able to create videos and webinars to

3    continue to reach others, and I know that it may seem odd,

4    someone with my background as coaching, but I believe that my

5    story can be used for good and that I can show others no matter

6    how far you fall, you always can stand back up.

7         Unable to arrange for community service through

8    probation, I was able to go out on my own and find ways to

9    serve, even if it wasn't official.  I now work twice a week

10   with our local food bank to assist those less fortunate than I

11   get what they need.  I work with our local church community

12   service inside a local nursing home to do a Bible study to help

13   those beautiful individuals get community every week.  I've

14   also signed up with our local literacy counsel where you can

15   help young adults learn to read.  Lastly, I have integrated

16   myself into my local community, meeting new people,

17   rearranging -- reengaging old friendships, and participating in

18   church.

19        Through the work that I've been able to create for

20   myself, I am paying down my debt.  Not only paying off the

21   loans that I had, but also paying my parents back, as you

22   mentioned.  At this time I've been able to pay just over

23   $15,000 back to them.  While I wish I could do it faster, it

24   has been consistently at least a thousand dollars each month,

25   and I did all of this in an effort to grow and heal and take

 1    very seriously the gift of freedom that I've been given.

 2         The mercy that you showed me here in court last year

 3    is the reason I am able to share all of this progress that I

 4    have made.  It is absolutely true that my first few months

 5    during and after sentencing I was still struggling.  I stood

 6    before you and told you I was healing, and I was.

 7         What I've learned is that when you have the depths of

 8    scars that I have, those that have caused all of my diagnoses,

 9    the PTSD, the dissociation disorder, the depression, the

10    anxiety, healing comes in stages.

11         When I stood before you in November, I had made a lot

12    of progress.  I was not the same person I was when we met the

13    first time.  And I begged for your mercy, as I do now.  Because

14    I knew, without a shadow of a doubt, I had so much more to go.

15    Today I am not the same person I was during that November court

16    date.  It is through the gift of freedom that I can say that.

17    With ongoing work and therapy and the unrelenting love of my

18    family, I have begun to truly have footing in my life again.

19         I cannot express to you in words how sorry I am that

20    we are here today.  Nor do I feel there are enough words to

21    show my regret and sadness for any and all harm I put Sara

22    through.  My efforts to salvage our relationship was deeply

23    misguided and truly painful, and I'm so sorry not only to that,

24    but for the continued pain I put my parents and my sister and

25    my brother-in-law and my family through by all of us having to

1    be here again.

2         I do not take lightly the effect my actions have had

3    on those around me.  I am asking you to continue to put your

4    faith in my recovery today.  I am still learning and healing.

5    Through the time you have given me so far, I have been able to

6    grow a new set of tools as strength to navigate my illness and

7    actively participate in my response to it when issues arise.

8    The progress I made is ultimately because of that mercy that

9    has allowed me to continue working with my therapist and doctor

10    to have the much needed support of my family and friends as I

11    heal, the ability to work for myself and actively pay off the

12    debt that I owe my parents, and the gift of being part of and

13    working with the community.  Please continue to have faith in

14    me.

15         THE COURT:  Thank you.

16         I didn't mean to cut you off.  I sensed you were

17    through.

18         THE DEFENDANT:  Yes.  I am done.  I'm sorry.

19         THE COURT:  Mr. Grennan, did you want to weigh in

20    here?  I assume your contact is more ongoing than Mr. Pakula's

21    with the defendant.

22         Mr. Grennan, are you still on the line?

23         Mr. Pakula, did you want to say anything, sir?

24         MR. PAKULA:  Your Honor, yes.  I would have deferred

25    any questions relating to Ms. Schneider's supervision to

1    Officer Grennan.  I don't want to comment on anything like

2    that, since I do not personally supervise her.

3         But we stand by our recommendation of 36 months'

4    imprisonment, your Honor.  We believe this is a serious breach

5    of the Court, the breach of the trust of the Court.  And for

6    those reasons we do recommend to your Honor a 36-month

7    imprisonment term with three years of supervised release to

8    follow.

9         THE COURT:  Thank you.

10        Is it possible for you to try to add in Mr. Grennan?

11   We seem to have lost him.

12        THE DEFENDANT:  Your Honor, he actually did just text

13   me.  He said that he has been muted.  He is trying to speak,

14   but hasn't been able to.

15        MR. FINZI:  Maybe, Desirae, we could ask him to either

16   call back -- is there any chance he is muted by the Court's

17   line?  He spoke earlier though.

18        THE COURT:  He spoke earlier, correct.  If you're

19   texting with him, tell him to try to unmute and see if he can

20   call in again.

21        THE DEFENDANT:  I am doing that now, your Honor.

22        THE COURT:  The Court did not mute him.

23        THE DEFENDANT:  I can see his number leaving, so I

24   think he is going to sign back in right now.

25        MR. GRENNAN:  Your Honor, this is Seth Grennan with

1    United States Probation.

2         THE COURT:  Thank you, Mr. Grennan, for joining us.

3         You were the probation officer, I take it, with the

4    most constant contact with the defendant.  I didn't know

5    whether you wanted to give me your own position here.

6         MR. GRENNAN:  Your Honor, outside of what has already

7    been reported to the Court, I have nothing to offer aside from

8    Ms. Schneider's compliance.  She has remained in compliance

9    with the conditions imposed by the Court outside of what's

10   already been reported.

11        THE COURT:  Thank you.

12        It is not free from doubt, but given the seriousness

13   of the offense, I do think it's appropriate that the defendant

14   understand the seriousness of the conduct.

15        I am going to sentence her to two months'

16   incarceration.  I think the shock value of that is important.

17   I am not going to sentence her to the length of time requested

18   by the government.  But I think being incarcerated in and of

19   itself will have salutary effects on the defendant, both from

20   the standpoint of punishment and from the standpoint of

21   rehabilitation and individual deterrence.

22        I am going to reimpose a three-year term of supervised

23   release -- it would not be probation.  It would be supervised

24   release -- with the standard and mandatory conditions that she

25   was serving her term of probation with, as well as the special

1    conditions of supervision, each one, which is in the November

2    3, 2021 judgment in this case.  I refer the parties to that.

3    But it would be the special condition number 1 of intensive

4    outpatient mental health treatment.

5              I take it it's not myTherapyNYC anymore.  Is that

6    correct, Mr. Finzi?  What should it be?

7              MR. FINZI:  It should be, your Honor --

8              THE COURT:  Why don't I make it a program to be

9    approved by the probation office.

10             MR. FINZI:  Thank you, your Honor.

11             THE COURT:  And everything else in special condition

12   number 1.

13             Special condition number 2 is attendance at the weekly

14   eye movement desensitization and reprocessing trauma therapy.

15   That's EMDR.

16             MR. FINZI:  I'm sorry to interrupt, your Honor.  I

17   think that that was a course of therapy that has been

18   completed.  In other words, that what they recommend is a

19   seven-month term and that has been completed.  I don't know

20   that it makes sense to reimpose that one.

21             THE COURT:  Let's go through each one.

22             Special condition number 1.  The defendant shall

23   participate in an intensive outpatient mental health treatment

24   program approved by the United States Probation Officer.  The

25   defendant must continue to take any prescribed medications,

1   unless otherwise instructed by the health care provider, and

2   she must contribute to the cost of services as render based on

3   her ability to pay and the availability of third-party

4   payments.  I authorize the release of available psychological

5   and psychiatric evaluations and reports, including the

6   presentence investigation report, to the health care provider.

7          Number 2 is:  The defendant shall serve the balance of

8   the 200 hours of community service that was previously imposed

9   on her during each year of supervised release.  The probation

10  office shall coordinate with the defendant on the type of

11  community service, and the defendant has notified me that

12  indeed she has done her own outreach on community service and

13  is now working with what sounds like two separate

14  organizations.

15         The next special condition of supervised release, I am

16  not going to reimpose home confinement.

17         The next condition is that she is permitted to live

18  with her parents in the Northern District of Illinois.

19         The next condition is that she must provide her

20  probation officer with access to all requested financial

21  information.

22         The next one is, she must not incur new credit charges

23  or open additional lines of credit without the approval of her

24  probation officer.

25         And the last one is, she will be supervised by the

1   Northern District of Illinois because that is the district of

2   residence.

3           Is the government seeking any additional special

4   conditions of supervision?

5           MS. DELL:  No, your Honor.

6           THE COURT:  I am sentencing her to two months'

7   incarceration, I am revoking probation, and I am imposing five

8   years of supervised release.  I didn't realize that was the

9   original sentence, five years of supervised release.

10          Ms. Schneider, you have the right to appeal the

11  sentence I just imposed on you.  If you cannot pay the cost of

12  the appeal, you have the right to appeal *in forma pauperis*,

13  which means that you won't have to pay any costs and you won't

14  have to pay for an attorney.

15          Do you understand your appeal rights?

16          THE DEFENDANT:  I do, your Honor.

17          THE COURT:  Ms. Schneider, you speak with Mr. Finzi

18  and with Ms. Lewis.

19          Once again, I have sentenced you quite liberally in

20  the sense of I understand a great deal of what you are doing is

21  through mental health issues.  But I do think the shock of

22  being in prison, even for two months, will help you understand

23  the seriousness of what you've done.

24          You have tremendous advantages here.  Your mother and

25  father have been behind you literally and figuratively every

1    step of the way here.  And you have the support of Mr. Finzi

2    and Ms. Lewis as well and their backup.  You also have other

3    family members on the line.  When you get out, continue to rely

4    on those.  And you cannot commit additional federal crimes.

5    You must understand that.

6         Mr. Finzi, is there anything else the defense would

7    like to add?

8         MR. FINZI:  No, your Honor.  Just three housekeeping

9    matters.

10        THE COURT:  I want to set a surrender date of October

11   28.  You shall report to the facility designated by the Bureau

12   of Prisons on or before 2 p.m. on October 28.

13        MR. FINZI:  Your Honor, that was one of the things

14   that I wanted to ask about.  Could we possibly get until early

15   December?  The reason I ask is only because to take care of the

16   medical issues, and she has been paid by patients going forward

17   for a couple of months.

18        THE COURT:  I'll make it December 2, on or before 2

19   p.m. on December 2.

20        What else, sir?

21        MR. FINZI:  The second is, a recommendation by the

22   Court, understanding it's not binding, for a facility as close

23   as possible to the Chicago metropolitan area.

24        THE COURT:  Yes.  I make that recommendation.

25        MR. FINZI:  The third, your Honor, is, to the extent

1    we haven't before dismissed all of the underlying violations or

2    specifications, which I think was part of the agreement to the

3    plea or admission of the specifications.

4              THE COURT:  The sentencing is due to the admission on

5    specifications 1 and 2.  There are additional specifications?

6              MR. FINZI:  Exactly.

7              THE COURT:  Ms. Dell, is that correct?

8              MS. DELL:  I don't believe there are.  But out of an

9    abundance of caution, that's fine.

10             THE COURT:  I don't think there are either, but I will

11   dismiss any open specifications.

12             MR. FINZI:  Thank you, your Honor.  I apologize if I

13   was wrong on that.  Maybe there were just things that were in

14   the report, but not included as specifications.

15             THE COURT:  Ms. Dell, do you have anything else?

16             MS. DELL:  No, your Honor.

17             THE COURT:  Ms. Schneider, I am going to tell you what

18   I told you over a year ago.  It's now up to you.  Do you

19   understand that?

20             THE DEFENDANT:  Yes, your Honor.

21             THE COURT:  Good luck.  Thank you.  The Court is

22   leaving the call.

23             (Adjourned)

24

25